ROBINSON-WAGNER CO., INC. *v.* UNITED STATES (No. 4710) [1]

---

United States Court of Customs and Patent Appeals, November 4, 1952

*Eugene R. Pickrell* (*Michael Stramiello, Jr., Esq.*, of counsel) for appellant.
*Charles J. Wagner*, Acting Assistant Attorney General (*Richard F. Weeks*, special attorney, of counsel), for the United States.

[Oral argument October 8, 1952, by Mr. Pickrell and Mr. Weeks]

Before GARRETT, Chief Judge, and O'CONNELL, JOHNSON, and JACKSON (retired), Associate Judges, and MORRIS, United States District Judge for the District of Columbia.

JACKSON, Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court, First Division, pursuant to its decision, C. D. 1363, overruling the protest of appellant claiming that two shipments of Wool Grease were improperly classified by the Collector of Customs at the port of New York as wool grease suitable for medicinal use at the rate of two cents per pound pursuant to paragraph 52 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T. D. 51802.

The pertinent portions of the involved paragraph read as follows:

Wool grease:
Containing more than 2 per centum of free fatty acids_____ ½¢ per lb.
Containing 2 per centum or less of free fatty acids and not suitable for medicinal use_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 1¢ per lb.
Suitable for medicinal use, including adeps lanae, hydrous or anhydrous_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 2¢ per lb.

In its protest the appellant claims the imported merchandise to be properly classifiable at the rate of one cent per pound under the said paragraph as wool grease containing two per cent or less of free fatty acids and not suitable for medicinal use, and that the grease is not adeps lanae, hydrous or anhydrous.

It appears that the imported goods were in two shipments, invoiced as "Wool Grease." One shipment contained 151 drums of the material covered by entry No. 785139 and dated March 17, 1949. The other shipment contained 148 drums covered by entry No. 791493, dated April 6, 1949.

It would seem, as was noted by the trial court, that in the wording of the involved paragraph, "including adeps lanae," wool grease other than adeps lanae is suitable for medicinal use. The issue, as tried by both parties, was whether the imported merchandise measured up to the requirement of the United States Pharmacopoeia for adeps lanae. The record on the part of appellant is substantially to the effect that only wool grease meeting the tests for adeps lanae, conforming to the United States Pharmacopoeia, is suitable for medicinal use. That evidence was not refuted by the Government, the record on behalf of which is much like that of appellant.

In the later shipment, consisting of 148 drums of wool grease, the drums were numbered from 152 to 299. Prior to delivery, and while the drums were on the wharf, a customs inspector drew a sample from each of three drums in both shipments, numbered 17, 67, 112, 160, 212, and 287. The samples were taken by means of what is called "a trier" which comprises a steel tube approximately three feet, three inches in length which is slotted along its length and has a beveled point at one end and a "T" shaped handle on the other. Each of the drums, which was cylindrical in character, had a bung on its top face. The bung was opened and the trier was inserted "as deeply as we can." The insertion, if the material is hard, always goes to at least one-half the length of the trier, but if the drum contains softer material, the trier is inserted for its entire length. It is inserted diagonally from the bung so that its tip rests over near the chime (edge of the barrel head). It is moved diagonally across to the opposite rim of the barrel head and then removed. Due to its structure, the trier then contains a core of the substance which is placed in a can as a sample and marked and numbered so as to identify it with the container from which it is taken.

The cans used in the instant case were new and each had a friction-type cover. The samples were then placed in a bag which was sent through official channels to the examiner of merchandise and subsequently chemically analyzed. The results of the analyses of those samples which are in evidence were testified to by Government witnesses as conforming to the United States Pharmacopoeia requirements as being anhydrous wool grease.

The sampling of the involved merchandise made on behalf of appellant was done under the supervision of a chemist and production manager of appellant. One of his duties was to check all raw materials received by his company. It appears that a number of samples, the number not given, were extracted from about ten per cent of 76 of

the 151 drums which were covered by entry No. 785139. Those samples were intermingled and melted into what was said to be a "preliminary composite sample." From the results obtained from such samples it was stated that it was necessary "to compile a completely composite sample; it was questionable." While the records of those findings were stated to be still in existence, they were not produced at the trial and the preliminary sample, so called, was destroyed. Subsequently, each of the two shipments of wool grease was divided into two batches. The grease from the drums of each batch was placed in a large processing tank, subjected to heat and thoroughly agitated so as to obtain a uniform mixture. After that had been done a sample was drawn from each of the batches for analysis. The samples are in evidence.

The analyses of the samples produced by appellant were stated to conform to the claim made in the protest, while the analyses of the samples produced by appellee were said to conform to the requirements of the United States Pharmacopoeia for wool grease suitable for medicinal use.

It is obvious that the results of the two methods of sampling are different and capable of producing different results.

There was nothing offered on behalf of the Government to dispute the evidence as to the sampling and analyses made by the employees of appellant. Neither was there any evidence pertaining to the sampling and analyses, offered by appellee, contradicted by appellant.

Under the state of facts hereinbefore set out, there can be no doubt that the samples drawn from the six individual drums by the customs officials contained wool grease properly classifiable as held by the collector. On the other hand, the composite method of sampling which was made by appellant would appear to represent the average composition of the entire shipment.

It will be remembered that the merchandise was imported in drums and from the record it is reasonable to believe that the contents of the individual drums differ in their chemical composition.

It seems to us, as was argued by counsel for the Government, that if a drum of grease, such as was sampled by the customs officials, were to be mixed with one or any number of drums containing less than the components and character of adeps lanae, the result of such composite sample would probably in some degree conform to the samples and analyses made by employees of appellant in their tests. Therefore, we agree with the reasoning in the decision of the trial court that the composite sample, representing an average, must be of lesser quality than the contents of the drums which held the better quality of the shipment.

It appears in the record that one of appellant's chief witnesses con-

ceded that the composite sample would be affected by the inclusion of a small amount of crude wool grease.

It appears that counsel for appellant criticized the individual drum-sampling technique of the customs officials because witnesses for the appellant testified that in each drum there was a variation between the top and bottom portions of the wool grease. It was stated that the heavier material tends to go to the top of the drum and the lighter to the bottom. Just what they may mean is rather puzzling to us. We are not skilled chemists but it has been our impression that heavier material in any mixture gravitates to the bottom, such as milk under cream. However, we must take the statement as being correct. It was not shown that in the sampling of a drum, if the instrument did not reach the bottom thereof, what kind of a sample would be obtained, whether better or poorer than an average quality sample.

There is nothing in the record to show whether the contents of any of the drums in the composite samples might have contained a better than average sample of the commodity. Such, however, it may well be. The record made on behalf of appellee is not refuted with respect to at least six drums of the entire shipment. It appears without contradiction that those drums contained wool grease suitable for medicinal use.

In view of all of the circumstances of the case, it appears to us, as it did to the trial court, that in the shipments there were two distinct commodities for tariff purposes. For the reason that the merchandise was imported in drums and some were of one tariff character, and some of a different tariff character, the merchandise as shipped was commingled.

The trial court cited section 508 of the Tariff Act of 1930 (19 U. S. C., sec. 1508) and pointed out that the conditions upon which the section becomes operative were met in the case of the shipment in at least six of the drums suitable for medicinal use and dutiable as was held by the collector, and that "since the question of whether any given drum contained one class or another of wool grease could only be determined by analysis thereof, the customs officers could not readily ascertain the number of drums containing each class of wool grease."

Counsel for appellant, in their brief, contend that the finding of the trial court was contrary to the weight of the evidence. In that connection they argue that it has been established that color and odor are important practical considerations in determining whether wool grease is actually practically and commercially suitable for medicinal use. It is argued that the United States Pharmacopoeia makes such factors part of the specifications in determining whether wool grease is medicinal grease.

The samples in evidence on behalf of the appellant all show a dark brown color, and those in evidence on behalf of the Government are likewise of a kind of brown color. Those samples, however, were taken some time ago and we find nothing in the record as to the effect of age, oxidation, or drying, on the color. Witnesses appearing for the Government testified that the Government samples, which were before them at the trial, were yellowish brown. They were questioned as to whether or not they were brownish yellow. As hereinbefore stated, we are not chemists, and whether Government samples were yellowish brown or brownish yellow to the eyes of a chemist, we feel ourselves incompetent to judge. However, it appears in the record that wool grease similar in all respects to that which was taken from the drums by the Government is bought and sold in great quantities as adeps lanae and suitable for medicinal use.

We cannot agree that the finding of the court is contrary to the weight of the evidence. Five witnesses, all highly skilled, testified for the appellant. Six witnesses, for the most part just as highly skilled, testified for the Government. Many exhibits are in evidence to support the divergent claims of the parties.

The trial court had the witnesses before it, had listened to their testimony, and it is axiomatic to say that the trial court is in a better position to form an opinion of the reliability of the testimony than can an appellate tribunal and, therefore, the findings of a trial court will not be set aside without good and sufficient reason. *United States* v. *Flexideal Dry Mat Co.*, 23 C. C. P. A. (Customs) 270, T. D. 48113.

For the reasons hereinbefore set out, the judgment of the United States Customs Court is *affirmed*.

JACKSON, Judge, retired, recalled to participate herein.

WILLIAM P. COLE, JR., Judge, having participated below, disqualified himself to sit in this case and JAMES W. MORRIS, United States District Judge for the District of Columbia, was designated and did serve herein, pursuant to the provisions of Title 28, United States Code, section 293.